UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FREEMAN DECORATING CO.                                CIVIL ACTION

versus                                                NO. 02-2103

ENCUENTRO LAS AMERICAS                                SECTION "C"(1)
TRADE CORP., THE CITY OF NEW
ORLEANS THROUGH THE OFFICE OF
THE MAYOR, METROVISION PARTNERSHIP
FOUNDATION, THE INTER-AMERICAN
DEVELOPMENT BANK, THE INTER-AMERICAN
INVESTMENT CORP., AND JULIO H.
GUICHARD, JR.


ORDER AND REASONS

Before the Court is Metro-Vision's Motion for Summary Judgment, Freeman

Decorating's Motion for Summary Judgment against MetroVision, and Freeman Decorating's

Motion for Summary Judgment against the City of New Orleans.  Having considered the

motions, the memoranda and exhibits, and the applicable law, the Court issues the following

Order.

Background

This contract dispute arose from a meeting of the Inter-American Development Bank

("IDB") in the City of New Orleans (the "City") in 2000.   Julio Guichard was Director of the

Office of International Relations and Trade Development for the City of New Orleans as well as

the unpaid Director of Encuentro Las Americas ("Encuentro"), a non-profit corporation created

by the City of New Orleans and supported through fund-raising.  (Rec. doc. 107, p. 3).

Guichard, together with then Mayor Marc Morial, put together a proposal for IDB to hold its

annual meeting in New Orleans, and IDB accepted.  (Id. at 4).  The City and the United States

Department of the Treasury executed an agreement reflecting the City's agreement to host the

IDB Annual Meeting.  The agreement stated:

> The City of New Orleans, Louisiana desires to have the forty-first Annual
> Meeting of the Board of Governor's of the Inter-American Development Bank,
> and the Fifteenth Annual Meeting of the Board of Governors of the Inter-
> American Investment Corporation, take place in New Orleans from March 23 to
> March 29, 2000.  The City of New Orleans, in view of the valuable benefits
> which will accrue to New Orleans, is willing to provide without charge certain
> services and facilities.  Based upon this offer by the City of New Orleans, the
> Secretary of the Treasury has extended to the Inter-American Development Bank
> an invitation for the United States to host the Forty-First Annual Meeting of the
> Board of Governors of the Inter-American Investment Corporation.  This
> Agreement is entered into to assure that the City of New Orleans will provide
> services and facilities specified herein.

(Id. at 5, attached as ex. D-9).

The IBD Meeting itself had no public component; it was simply meetings and seminars.

In order to provide a public component, a Technology Village was added to give companies

sponsoring the IBD Meeting an opportunity to showcase their wares.  (Id. at 6)  Fundraising

efforts were disappointing.  With only two months remaining before the commencement of the

meeting, only $265,000 had been committed.  (Id.)  Due to the lack of funds, the City requested

assistance from the State of Louisiana ("State").  The State agreed to give $500,000 but required

that the money be received by and distributed through MetroVision rather than the City.  (Id. at

6).  MetroVision is a non-profit corporation that worked together with the New Orleans Chamber

of Commerce to encourage economic development in the City.  (Id. at 2).  MetroVision asserts

2

that it was the organization that would go out and attract business, while the Chamber of Commerce focused on enhancing the business climate through public policy.  (Id.).

As part of the agreement to contribute $500,000 in funds for the IBD Meeting, the State executed a Corporate Endeavor Agreement ("CEA") with MetroVision on February 18, 2000. In the CEA, the State identified categories that could be paid with the funds.  The six categories were 1) The build-out, construction, rental of space and security for the Technology Village; 2) Inaugural Session; 3) Printing of promotional literature; 4) Interpretive services; 5) Closing event, and 6) Treasury Dinner.  (CEA section II, "Scope of Services," Rec. doc. 107, ex. 7).[1] The CEA specified that "expenditures shall be in accordance with the Budget attached as Exhibit B."  (Id.).

Exhibit B of the CEA was a document entitled "Louisiana Economic Development Corporation Inter-American Development Bank 2000 Budget."  ("Budget") (Rec. doc 107, ex. 8).  The Budget  contained a breakdown of the costs by category, including $125,000 for the Technology Village, for a total of $684,100.  The Budget  specified that "of the $684,100.00, the Louisiana Economic Development Corporation shall be responsible for an amount equal to or not to exceed $500,000.00."  (Id.).  Thus, it is evident that the funds from the State would not fully cover the expenses in the Budget.

The CEA did not specify how MetroVision would go about distributing the State's funds, other than requiring the funds to go towards expenses in the specified categories.  MetroVision did develop a process.  (Rec. doc. 117, p. 11 note 8).  After the funds were provided by the State,

_____

[1] The terms of the CEA stats that MetroVision agrees to "underwrite" the costs in these six categories.

they were put into an separate account.  MetroVision and the Chamber would pay for expenses

out of their own funds, and then get reimbursed from the account containing the State funds.  (Id.

at 11).  The City would typically receive the invoices from the vendors and make requests to

MetroVision to pay the invoice.  (Rec. doc. 107, p. 13).  Thus, to some extent, the City approved

each expenditure, according to Freeman Decorating. (Rec. doc. 106, p. 12).   Linda Prudhomme,

the Executive Vice President of Metro Vision had the responsibility of monitoring the invoices

to ensure that they fit into categories identified in the CEA.  (Id.).  If the invoice fell under one of

the CEA categories, and sufficient funds remained, then Prudhomme would have Mack

Matthews, MetroVision's Chief Financial Officer, issue a check directly to the vendor.  (Id.).

Prudhomme indicated in her deposition that it was her practice to authorize reimbursement only

to written requests that included invoices, and that properly submitted invoices would be

reimbursed, in full and in advance of services being rendered, as well as on a first come, first

serve basis.  (Rec. doc. 106, p. 7-8).   The CEA provided that MetroVision was to provide

reports of the costs funded by the State, and those reports were to include copies of the invoices.

(CEA, Rec. doc. 117 ex. 8).

     The task of constructing the Technoloy Village belonged exclusively to Freeman

Decorating.  MetroVision wrote Freeman Decorating a check in the amount of $45,000.  In

MetroVision's report to the State, there was no invoice to explain either the purpose or amount

of the check.  By contrast,  the report contained copies of the invoices for each of the checks

made out to the other seven vendors receiving State funds.

     Freeman Decorating asserts that there was no basis for the $45,000 check because

MetroVision was aware that the cost of the Technology Village was $125,000.  As noted, the

4

Budget attached to the CEA earmarked $125,000 for the Technology Village.  Also, on March 9, 2000, Gail Varuso of Freeman Decorating alleges she mailed to MetroVision a proposal that represented the cost of the building the Technology Village as $125,000, and with a signature line intended for a MetroVision representative.  ("March 9 proposal letter") (Rec. doc. 117, ex. 11).  Page 5 of the letter indicated that it was not an invoice but rather an estimate, and a final invoice would be submitted at the end of the Conference.  (Id.).   The March 9 proposal letter was never signed; Linda Prudhomme insists she never received it. (Rec. doc. 106, p. 15).  In addition, Freeman Decorating sent a payment schedule dated March 9 to Julio Guichard at Encuentro, also indicating a cost of $125,000.  ("March 9 payment schedule") (Rec. doc. 117, ex. 10).  Finally, Stephen Haggstette, Regional Vice President of Freeman Decorating, claims that he called MetroVision when the full $125,000 was not forthcoming.  (Rec. doc. 106, p. 17-18).  According to Hagstette, he called MetroVision a couple days prior to the event and demanded 50% payment.  Hagstette could not identify the woman to whom he spoke, but he got the impression that she "obviously had saw the (March 9) letter that we knew about, the letter and the amount that we had forwarded to them and was being expected for them to pay."  (Id. at 18).  In addition to the March 9 proposal letter sent to MetroVision, Gail Varuso also sent a payment schedule, indicating the cost of the Technology Village, to Encuentro.  ("March 9 payment schedule") (Rec. doc. 117, ex. 10).


**Freeman Decorating and Metro Vision's Cross Motions for Summary Judgment**

Freeman Decorating and MetroVision have filed cross motions for summary judgment on the issue of MetroVision's liability for the debt owed to Freeman Decorating.  Specifically,

Freeman Decorating asserts, and Metro Vision denies, that MetroVision is responsible for the debt based on six theories of liability; 1) MetroVision is liable due to the terms of the CEA itself; 2) MetroVision is liable because it failed to follow the disbursement procedures; 3) MetroVision is liable for the commitments that the City, as MetroVision's agent, made to Freeman Decorating; 4) MetroVision is liable because Freeman Decorating detrimentally relied on an assurance of payment; 5) MetroVision is liable because Freeman Decorating is a third party beneficiary of the CEA; and 6) the City and MetroVision were Joint Venturers.

**A. Standard of Review**

A district court can grant a motion for summary judgment only when the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mutual Automobile Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . [and a] fact . . . [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Technologies, Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986)).

"If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."  *Engstrom v. First National Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995) (citing *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53, and Fed. R. Civ. P. 56(e)).  The mere argued existence of a factual dispute will not defeat an otherwise properly supported motion.  *See Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  *Id.* at 249-50, 106 S. Ct. at 2511 (citations omitted).

**B. Analysis**

  **1. "Four Corners of the Contract"**

Freeman Decorating first argues that MetroVision is bound by the terms of the CEA.  The  CEA, and agreement between the State and MetroVision, confirmed the State's commitment to contribute $500,000 plus interest in funds to pay for part of the IDB Meeting's $684,100 budget, provided that those funds go only towards the six categories previously listed.  MetroVision in turn agreed to "underwrite" the costs in those six categories in accordance with the Budget.  In other words, MetroVision was to disburse the funds until they ran out.

The Court does not regard the CEA as creating a contractual obligation for MetroVision to pay all expenses in the Budget in their entirety.   Taking the contract as a whole, it is apparent that MetroVision took on the responsibility to "underwrite" the various expenses only to the extent that the State's funds  would allow, and the contract specifically states that the State "shall be responsible for an amount equal to or not to exceed $5000,000.00."  (CEA Exhibit B,

Budget; Rec. doc., 117, ex. 7).  Nowhere in the four corners of the contract does it state that MetroVision was obligated to do anything other than disburse the State's money, or that MetroVision was obligated to pay for any expenses exceeding  the funds that the State provided. Moreover, Freeman Decorating was not a party to the contract, and as such cannot be bound by classical contract principles.  Accordingly, MetroVision is not bound under the four corners of the contract to pay for the remaining debts owed to Freeman Decorating.

### 2. Failure to Follow Disbursement Procedure

Freeman Decorating next argues that MetroVision's failure to properly disburse the funds has harmed Freeman Decorating, and MetroVision should be liable for those damages.  Freeman Decorating is referring to MetroVision's alleged failure to follow its policy of paying invoices (provided the expenditures were from a proper category) in full once they are approved and on a first come, first serve basis.  In particular, Freeman Decorating asserts that MetroVision had notice of Freeman Decorating's expenses by virtue of the March 9 proposal letter mailed to MetroVision and the March 9 payment schedule mailed to Encuentro, and that despite this notice MetroVision did not pay in full.  (Rec. doc. 106, p. 22).

Freeman Decorating is essentially arguing that MetroVision violated the terms of the CEA by not paying in full upon receiving notice of Freeman Decorating's expenditures. However, for the reasons stated above, the Court finds that the CEA did not obligate MetroVision to pay all invoices in full.  Even if there were such an obligation, it cannot be said that any deviation from the disbursement procedures  would violate the contract.  As previously noted, the CEA did not contain any provisions detailing how to go about making the payments;

MetroVision's payment procedure was instead derived from practice.

Though the Court finds that MetroVision was not contractually bound to pay in full upon receipt and approval of an invoice, the record reflects that this was MetroVision's general practice. Failure to follow this standard procedure to the detriment of Freeman Decorating may entitle Freeman Decorating to an equitable remedy. The question then become whether Freeman Decorating detrimentally relied on MetroVision following its practice of paying approved invoices in full on a first come, first serve basis. The Court will address this issue in a later section on detrimental reliance.

### 3. Agency

Freeman Decorating also asserts that MetroVision is obligated to pay under the theory of agency. The State's funds could only by distributed by MetroVision upon authorization from the City, according to Freeman Decorating. (Rec. doc. 106, p. 24). Thus, Freeman Decorating claims, "MetroVision required that vendors make their requests and provide their documentation to the City." (Id. at 25). "Thus, the City was MetroVision's agent in the processing of State funds. MetroVision therefore became responsible for its agent's commitments to Freeman Decorating." (Id.).

The Court finds this to be a dubious argument. MetroVision had no role other than to pay out on the invoices it received pursuant to the Agreement with the State. It just so happens that the invoices are received from the City, but this is because it was the City who solicited the vendors's services, not MetroVision.

MetroVision counters that it was the City and Encuentro who put on the IDB Meeting

and hired the vendors like Freeman Decorating.  (Rec. doc. 117, p. 12).  Thus, it was the City

and Encuentro who would receive invoices from the vendors, and would then make a decision

whether to pass them on to MetroVision, where Linda Prudhomme would examine/re-examine

the invoices for sufficiency. Thus, the City or Encuentro would decide which invoices would

reach the eyes of Prudhomme.  (Id.).

        The Court finds that there is no basis for concluding that the City was an agent of

MetroVision.  Freeman Decorating's assertion that "MetroVision required that vendors make

their requests and provide their documentation to the City" (Id. at 25) is unsubstantiated and

illogical.  In its Opposition to MetroVision's motion, Freeman Decorating wrote:

> In response to discovery, MetroVision acknowledged the City's control of
> disbursements:
>
> > ... MetroVision was in charge of distributing the $500,000.00 pursuant
> > to the instructions of Julio Guichard and Rene (sic) Lapeyrolerie ...
>
> (citing Response to Interrogatory No. 3).  Witnesses confirmed under oath that the
> City approved each expenditure in advance.  Thus, for example, Ms. Renee
> Lapeyrolerie of the City testified that there was a procedure where Julio Guichard
> would approve monies to be paid out of the MetroVision money.

(Rec. doc. 113, p. 6-7).  These allegations of City control over the process directly contradict the

notion that the City was acting as an agent of MetroVision.  For the City to both have control

over the process and simultaneously be an agent of MetroVision would mean that MetroVision

took the affirmative action of subjugating itself to the City, and there is no evidence of

MetroVision having done this.   The record indicates that, while it may be a genuine issue as to

whether and to what extent the City was controlling the disbursement process and MetroVision

was acting as the City's agent, there is no genuine issue as to whether MetroVision was

controlling, or gave control to, the City.  Accordingly, the Court concludes that MetroVision is

not liable for the debt under a theory of agency.

### 4. Detrimental Reliance

Freeman Decorating offers two grounds for arguing detrimental reliance.  The first, as previously noted, is the implicit allegation that Freeman Decorating detrimentally relied on MetroVision to follow its practice of paying invoices, once approved, in full and on a first come, first serve basis.  (Rec. doc. 106, p. 22).  The second is the allegation that Freeman Decorating detrimentally relied on MetroVision's assurance of payment made when MetroVision agreed in the CEA to "underwrite" the cost of the Technology Village.  (Id., p. 27; rec. doc. 113, p. 23).

Louisiana Civil Code article 1967 states in pertinent part:

> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying.

In its argument concerning MetroVisions' failure to follow its proper disbursement procedures, Freeman Decorating implicitly argues that it relied to its detriment on MetroVision's promise to follow its practice of paying invoices in full, which allegedly would have resulted in Freeman Decorating receiving $125,000 instead of $45,000.  However, the record does not reflect that MetroVision made any promises to Freeman Decorating regarding its disbursement procedure.  In fact, Freeman Decorating does not even allege that it knew of MetroVision's disbursement procedure.  As such, the Court finds that Freeman Decorating could not have detrimentally relied on MetroVision following any particular disbursement procedure.

With respect to Freeman Decorating's claim that it relied to its detriment on MetroVision following through in its assurances in the CEA to "underwrite" the cost of the Technology

Village, the Court finds that it must also fail.  The CEA was a contract between the State and

MetroVision.  MetroVision made no assurances to Freeman Decorating.[2]  In fact, the evidence

gives no indication that Freeman Decorating was aware of the CEA prior to conducting

discovery in the course if this litigation, thereby refuting the notion that Freeman Decorating

could have relied on the assurances made in the CEA.  To the extent that Freeman Decorating is

claiming that it relied on promises made by the City as MetroVision's agent, the Court has

already established in the preceding section that the City was not an agent of MetroVision's, and

thus MetroVision is not bound by the City's representations.


### 5. Third Party Beneficiary

Freeman Decorating next argues that it is a third party beneficiary of the CEA between

the State and Metro Vision.

Article 1978 of the Louisiana Civil Code provides:

A contracting party may stipulate a benefit for a third person called a third party
beneficiary.
Once the third party has manifested his intention to avail himself of the benefit,
the parties may not dissolve the contract by mutual consent without the
beneficiary's agreement.

Under Louisiana law, a contract for the benefit of a third party is referred to as a stipulation pour

autrui.  *Concept Design v. J.J. Krebs & Sons, Inc.*, 692 So.2d 1203, 1206 (1997).   "A contract,

---

[2] Freeman Decorating argues that "Freeman Decorating made it clear that it relied upon the commitment of MetroVision to forward," citing pages 89 and 90 of the deposition of Sidney Artigues of Freeman Decorating.  These passages simply indicate that Mr. Artigues sent a proposal letter to Linda Prudhomme but does not specifically recall speaking with her, and that he felt more comfortable dealing with MetroVision than Encuentro. The Court finds that these passages are not evidence of any assurances of payment.

in order to constitute a stipulation pour autrui, must be 'in writing and clearly manifest an intention to confer a benefit upon a third party.'" *Id*. at 1206, *citing Depaul Hospital v. Mutual Life Ins. Co.*, 487 So.2d 143, 146 (La. App. 4th Cir. 1986).

The Court agrees with MetroVision that the Freeman Decorating cannot be considered a third party beneficiary under Louisiana law because the CEA made no specific mention of Freeman Decorating.  At best, it can be said that the CEA was intended to provide some funding, as opposed to full funding, in specifically mentioned areas, such as the Technology Village. However, this benefit could have been conferred on any contractor hired to build the Technology Village, and was not specifically conferred in writing upon Freeman Decorating.


### 6. Joint Venture

MetroVision argues in its own motion for summary judgment that Freeman Decorating cannot prove its joint venture claim.  (Rec. doc. 107, p. 17).  Interestingly, Freeman Decorating does not make a "joint venture" claim in its own motion for summary judgment (rec. doc. 106), but it does  present a joint venture claim in its opposition to MetroVision's motion.  (Rec. doc. 113, p. 18).

Freeman Decorating asserts that MetroVision was a joint venturer, along with the City , the State, Encuentro, in putting on the IBD Meeting.  The requisite criteria for the existence of a joint venture are:

1) a contract between two or more persons;

2) a juridicial entity or person is established;

3) contribution by all parties of either efforts or resources;

13

4) the contribution must be in determinate proportions;

5) there must be joint effort;

6) there must be mutual risk vis-a-vis losses;

7) there must be sharing or profits.

*Cajun Electric Power Cooperative v. McNamara*, 452 So.2d 212, 215 (La.App. 1 Cir. 1984).

The existence or nonexistence of a joint venture is a question of fact, although what constitutes a

joint venture is a matter of law." *Id*. at 216.  Courts look to the totality of the evidence to

determine the existence of a joint venture.  *Id*.  Members of a joint venture are liable for the

debts of the joint venture.  *See Comeaux v. C.F. Bean Corp.*, 750 So.2d 291, 298 (La.App. 4 Cir.

12/15/99).

MetroVision argues that the seventh requirement – sharing or profits – is not present

because MetroVision is a not for profit company, and also because it did not receive any

remuneration for distributing the funds pursuant to the CEA.  (Rec. doc. 107, p. 18).

Notwithstanding whether this requirement is satisfied, or the fact that MetroVision fails to

challenge any of the other six requirements, the Court finds that the sixth requirement is not

satisfied.  The evidence indicates that  MetroVision had no role in the IBD meeting other than to

donate $25,000 in cash and $25,000 in  "in kind" services, and distribute the State's $500,000

pursuant to the CEA.  Unlike Encuentro, MetroVision signed no contract assuring payment and,

accordingly, assumed no risk.  (Rec. doc. 103, p. 3).  At most, MetroVision can be characterized

as a corporate sponsor of the IBD meeting that took on an additional administrative duty on

behalf of the state, not as a joint venturer.  Thus the Court finds that the joint venturer argument

is without merit.

14

**B. Conclusion**

In conclusion, the Court finds that there is no basis for holding MetroVision accountable for the $80,000 debt owed to Freeman Decorating for the construction of the Technology Village.  MetroVision was not bound by the four corners of the CEA to pay Freeman Decorating, nor did MetroVision breach the terms of the CEA by failing to follow certain disbursement procedures.  MetroVision is neither liable for any representations allegedly made by the City under the theory of agency, nor is it liable  due to any detrimental reliance on the part of Freeman Decorating, nor is Freeman Decorating entitled to relief from MetroVision as a third party beneficiary of the CEA.  Finally, the Court finds that MetroVision was not a part of any joint venture to put on the IBD meeting.  Therefore, MetroVision's motion for summary judgment shall be granted, while Freeman Decorating's motion for summary judgment against MetroVision is without merit.

**Freeman Decorating's Motion for Summary Judgment against the City**

**A. Additional Background**

The Motion pertaining to Freeman Decorating's claim against the City requires additional background information, particularly with respect to Encuentro.  Now defunct, Encuentro was a non-profit organization set up by the City as a separate entity in 1997.  (Rec. doc. 121, p. 4).  It was designed to  host the Encuentro trade show and other events concerning international trade and development.   Julio Guichard was Encuentro's Director, as well as the City's Director of International Relations.  According to Guichard's deposition, Encuentro operated rent free out of his City office and used the City's office materials, such as stationary .

(Rec. doc. 103, p. 4).  Guichard received his salary from the City, and not Encuentro.  (Id.).

Encuentro had at least one contract employee, Renee Lapeyrolerie, who was not a City

employee.  (Rec. doc. 121, p. 2).

It is undisputed that Julio Guichard of Encuentro entered into a contract with Gail Varuso

of Freeman Decorating for its services at the IDB Meeting.  No other party was a signatory to the

contract.  Freeman Decorating had initially submitted a contract proposal indicating that the

other contracting party was "The City of New Orleans," however, Mr. Guichard crossed out the

wording and wrote in "Encuentro Las Americas" in his own hand. (Rec. doc. 121, ex. C).   Mr.

Guichard testified that he did so because "we were trying to get everything coming to Encuentro

Las Americas."  (Guichard depo. p. 172, ln. 22-24).


**B. Argument and Analysis**

Freeman Decorating seeks summary judgment on the issue of the City's liability for the

debt owed by Encuentro.  The common thread among the proffered theories of liability is that

Encuentro and the City are effectively two indistinguishable entities.  Freeman Decorating

argues that the record supports the conclusion that Encuentro and the City did business in such a

way that Freeman Decorating and others were confused about the distinction between the two.

Consequently, Freeman Decorating argues, the City can be held liable for Encuentro's debts

because 1)  Encuentro and the City are solidary obligors or a single business enterprise; 2)

Encuentro was an agent with apparent authority to bind the City; and 3) Detrimental Reliance.


**1. Confusion**

16

Guichard's own testimony, Freeman Decorating argues, reveals the confusing nature of Encuentro's relationship with the City.  When asked about  his duties as Director of Encuentro, he stated, "I saw my duties as (sic) Encuentro as kind of an extension of my duties as Director of International Trade."  (Rec. doc. 103, p. 4; Guichard depo. p. 27, ln. 4-6).  When asked about his use of City stationary for Encuentro-related business, he responded that he did not perceive it as a problem "because I saw Encuentro as a mechanism of my office.  I saw it as part of my office." (Id. at 5; Guichard depo. p. 44, ln. 18-24).  When pressed about the nature of Encuentro's relationship with the City, he replied:

> Encuentro was the vehicle that we used to these international events.  Gail Varuso, and everyone that did business with my Office of International Trade, understood that Encuentro was something we used so that vendors, the people that contributed money, would make the checks out to Encuentro Las Americas instead of the City of New Orleans.

(Id.; Guichard depo. p. 166, ln. 4-13).  And:

> I always, like I said earlier, Encuentro was part of my office at the City of New Orleans.  Whenever we did any of the events prior to the IDB and money was needed, the City would fund Encuentro through an EBF grant not always for the full amount but for an amount, okay.

(Id. at 6, Guichard depo. p. 179, ln. 12-18).  With respect to any debts owed by Encuentro, Guichard acknowledged that "most, if not all the bills for Encuentro Las Americas were paid from Encuentro Las Americas' funds that we identified through fundraising."  (Guichard depo. p. 38, ln. 3-6).  However, should those funds be insufficient, Guichard acknowledged that no one from the City told him that the City would be responsible for Enceuentro's debts, but that he had arrived at the assumption  that the City would be responsible for any outstanding debts.  (Id., p. 179, ln. 24-25; p. 180, ln. 1-2).  Finally, with respect to the City's efforts to raise funds to pay the debts to Freeman Decorating, Guichard was asked:

Q: This money that you were looking off of Freeman when the Mayor was leaving Office, was this Encuentro money?  Or City money?

A: It would have been City money given to Encuentro through the Economic Development Trust Fund.  I think that someone found money left in the trust fund.

Q: Why would you use City money to pay an Encuentro bill?

A: Because we felt that we owed this money.
                        ...
"We" is my office and the Mayor of the City of New Orleans.

Q: Your office (at) Encuentro?

A: My office – at that time, I was the director of Economic Development (at the City).

(Guichard depo. p. 197, ln. 6-25; p. 198, ln. 1-3).

Guichard's inclination to conflate the functions of Encuentro and the City's Office of International trade is understandable in light of the confusing business practices of the two.  For instance, it has already been noted that Guichard would conduct Encuentro business on the City's stationary.  The City would also contribute to Encuentro's funding, as it did on April 23, 2002 when the City's Economic Development Fund deposited $95,281.56 into Encuentro's account.  (Rec. doc. 103, p. 8, ex. M).

Not unexpectedly, the close relationship between Encuentro and the City led to confusion among businesses with respect to which entity they actually dealing with.  The record provides numerous instances of businesses conflating Encuentro with the City.  For example, Entergy donated $25,000 to Encuentro's account, but issued the check to:

Encuentro Las Americas
International Economic Development
Mr. Julio Guichard

(Rec. doc. 103, p. 8, ex. N).  Arena Advertising did business with Encuentro and sent its bills to:

City of New Orleans
Encuentro Las Americas
International Relations and Trade Development

(Id., ex. I).  Similarly, Bella Luna sent Encuentro bills to:

Mayor Marc Morial's Office
1300 Perdido Street
City Hall
N.O., LA 70112.

(Id. ex. J).  Guichard paid this bill for $587.69 from Encuentro's account.  (Id.).  Bills from the

New Orleans Intercontinental Hotel were also paid out of Encuentro's account.  (Id., ex. K).

Like the companies, Freeman Decorating was also confused about any distinction

between Encuentro and the City.  Gail Varuso, who signed the contract with Encuentro, testified

that she "believed she was contracting with the City of New Orleans."  (Rec. doc. 103, p. 13).

Evidently this would not have come as a surprise to Guichard, who testified:

> Q: When you did business with people, for example, Gail Varuso, did you ever
> hold yourself out to be a representative of the City of New Orleans or a
> representative of Encuentro?
>
> A: I think that in the case of Gail Varuso she probably saw me as one in the same
> as if both of those things were the same thing.
>
> Q: But my question to you specifically is: Did you ever tell her that you represent
> the City of New Orleans or did you tell her that you represent Encuentro as
> Director?
>
> A: I think I told her that I was Director of International Trade for the City.

(Id., p. 5, Guichard depo. p. 163, ln. 23-25; p. 164, ln. 1-10).

**2. Solidary Obligors - Single Business Enterprise**

Freeman Decorating first argues that the confusing nature of the inter-relationship between Encuentro and the City has made the them a single business enterprise, or solidary obligors.  "The legal fiction of a distinct corporate entity may be disregarded when a corporation is so organized and controlled as to make it merely an instrumentality or adjunt of another corporation.  If one corporation is wholly under the control of another, the fact that it is a separate entity does not relieve the latter from liability."  *Green v. Champion Insurance Co.*, 577 So.2d 249, 257 (La. App. 1 Cir. 1991), *citing Lucey Manufacturing Corporation v. Oil City Iron Works*, 131 So.57 (La. App. 2nd Cir. 1930).  In addition to the "piercing the corporate veil" theory to disregard a corporate identity, some Louisiana courts have used the "single business enterprise" theory.  *Id*.  The factors that may be considered in determining whether a group of entities constitute a single business enterprise:

1) corporations with identity or substantial identity of ownership, that is ownership of sufficient stock to give actual working control;

2) common directors or officers;

3) unified administrative control of corporations whose business functions are similar or supplementary;

4) directors and officers of one corporation act independently in the interest of that corporation;

5) corporation financing another corporation;

6) inadequate capitalization;

7) corporation causing the incorporation of another affiliated corporation;

8) corporation paying the salaries and other expenses or losses or another corporation;

9) receiving no business other than that given to it by its affiliated corporation;

10) corporation using the property of another corporation as its own;

11) noncompliance with corporate formalities;

12) common employees;

13) services rendered by the employees of one corporation on behalf of the other;

14) common offices;

15) centralized accounting;

16) undocumented transfers of funds between corporations;

17) unclear allocation of profits and losses between corporations; and

18) excessive fragmentation of a single enterprise into separate corporations.

*Green*, 577 So.2d at 257-58.

The Court finds that the record contains sufficient justification for the conclusion that Encuentro and the City were a single business enterprise. Julio Guichard was the Director for Encuentro as well as Director of the International Relations for the City. Both entities shared the same administrative services. Encuentro received funding from the City and, as evidenced by its debts following the IBD Meeting, it was underfunded. The City was the reason behind Encuentro's incorporation in 1997. Guichard was paid by the City and not by Encuentro, and has indicated that the City would or should pay Encuentro's debts. Encuentro would share property such as stationary, and used a common office with the City. Although financial activities between Encuentro and the City do appear to be properly reflected in the books, it is clear that the City exerted the authority to direct Encuentro's finances. In essence, the evidence overwhelmingly suggests that Encuentro was little more than a separate bank account for the City to conduct its business in international relations. In terms of the structure, finances, and

21

operations, the evidence shows that Encuentro was not operating as an entity distinct from the City, despite its separate incorporation.  Therefore, the Court finds that it are no genuine issues of material fact, and it is proper to apply the single business enterprise theory.  Nevertheless, the Court will also analyze Freeman Decorating's remaining two theories of liability.

### 3. Apparent Authority

Freeman Decorating next asserts that the City is responsible for the debts because it acted in such a way that Freeman Decorating believed that Encuentro had the authority to act for the City.

In Louisiana, an agency relationship can be created by implied appointment arising from apparent authority.  *Ehlinger & Associates v. Louisiana Architects Ass'n*, 989 F.Supp. 775,787 (La. E.D. 1998).  The question of apparent authority "turns on whether the principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied in the agent's authority."  *Id.*

The Court finds that the City, as the principal, conducted itself in such a way that Freeman Decorating reasonably believed that Encuentro was its agent.  In dealing with Encuentro, the signatory to the contract, Freeman Decorating believed it was dealing with the City as well as Encuentro, as though they were one and the same.  Renee Lapeyrolerie, an employee of Encuentro, testified that Julio Guichard, who was Encuentro's Director as well as the City's Director of International Relations, represented himself to Gail Varuso of Freeman Decorating as a representative of the City.  (Rec. doc. 103, p. 11; Lapeyrolerie depo, p. 73, ln. 6-18).  This is an instance of the City holding out Encuentro as its agent.  Given these

representations, it was reasonable for Freeman Decorating to believe that signing the contract

with Encuentro was like signing a contract with the City.  Accordingly, the Court finds that the

City is also liable for Freeman Decorating's debts on the basis of the doctrine of apparent

authority.

### 4. Detrimental Reliance

Finally, Freeman Decorating claims that the City is bound by detrimental reliance.  As

previously noted, the principle of detrimental reliance can bind a party that makes a promise that

induces the other party to rely on it.

The previously cited evidence demonstrates that Mr. Guichard, representing himself as

the Director of Economic Development for the City, made assurances of payment to Gail

Varuso, and that Ms. Varuso acted on the belief that signing the contract with Encuentro was

tantamount to having a contract with the City.  As such, Freeman Decorating relied to its

detriment on the City's promise to pay for its services.

## C. Conclusion

With respect to Freeman Decorating's Motion for Partial Summary Judgment as to the

liability of the City of New Orleans for any debts that Encuentro owes to Freeman Decorating,

the Court finds that the City is liable under the theories of single business enterprise, apparent

agency, and detrimental reliance.

Accordingly,

**IT IS ORDERED** that Freeman Decorating's Motion for Summary Judgment against

23

MetroVision is **DENIED**.

 **IT IS FURTHER ORDERED** that MetroVision's Motion for Summary Judgment against Freeman Decorating is **GRANTED**.

 **IT IS FURTHER ORDERED** that Freeman Decorating's Motion for Partial Summary Judgment against the City of New Orleans as to liability is **GRANTED**.  The amount for which the City is liable remains to be determined.

 New Orleans, Louisiana, this 24th day of August, 2005.


           HELEN G. BERRIGAN
         UNITED STATES DISTRICT JUDGE